UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                Case No. 22-cr-135 (MJD/LIB)

                Plaintiff,

                                                **ORDER AND**
v.                                     **REPORT AND RECOMMENDATION**

Gerald Wayne Johnson,

                Defendant.

This matter comes before the undersigned United States Magistrate Judge, pursuant to a general assignment made in accordance with 28 U.S.C. § 636, upon the parties' various pretrial Motions. The Court held a Motions Hearing on October 28, 2022, regarding the parties' pretrial Motions for the discovery of evidence, as well as, Defendant's Motions to suppress evidence. (Minutes [Docket No. 30]).

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25], were taken under advisement.

For the reasons discussed herein, the Government's Motion for Discovery, [Docket No. 14], is **GRANTED**, as set forth herein; Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 20], is **GRANTED**, as set forth herein; Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 21], is **GRANTED**, as set forth herein; Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 22], is **GRANTED**, as set forth herein; and

Defendant's Motion for Discovery and Inspection, [Docket No. 23], is **GRANTED**, as set forth herein.

Further, for reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], be **DENIED**, and that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25], be **DENIED**.

**I.     Background and Statement of Facts**

**A.  Background**

Defendant is charged with two (2) counts of Involuntary Manslaughter in violation of 18 U.S.C. §§ 1112, 1151, and 1153(a). (Indictment [Docket No. 1]).

**B.  Facts**[1]

In the morning hours of November 6, 2021, Criminal Investigator Christopher Sumner (hereinafter "CI Sumner") received a call informing him that there had been a motor vehicle accident involving a vehicle with two occupants in the Pima area of the Red Lake Indian Reservation. (Tr. 9–10).[2] CI Sumner went to the scene of the accident where he "observed the vehicle" to be "basically ripped open." (Tr. 10). After instructing another law enforcement officer to stay on the scene, CI Sumner proceeded to the Red Lake Hospital "to see who was in the vehicle at the time." (Tr. 10).

Upon arriving at the Red Lake Hospital at approximately 8:04 a.m., CI Sumner was advised that the subject vehicle's sole passenger, R.M.R., had been pronounced dead. (Tr. 10).

---

[1] The facts contained in this section are derived from the parties' exhibits admitted in the present case, as well as, the October 28, 2022, Motions Hearing testimony of Christopher Sumner, a Criminal Investigator for the Red Lake Police Department, and Ron Leyba, who previously and at all times relevant to the present case was a Criminal Investigator for the Red Lake Police Department.

[2] Throughout this Order and Report and Recommendation, the Court refers to the transcript of the October 28, 2022, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 33]).

CI Sumner also learned that the driver of the vehicle was Defendant, and Defendant was receiving care for his injuries. (Tr. 10–11).[3] After being provided with Defendant's room location, CI Sumner went to said room where he observed Defendant prone on a medical bed wearing a C-collar and facing upwards. (Tr. 11–12; Gov't Ex. 2).[4] CI Sumner testified that there were "one or two" members of the medical staff in the room tending to Defendant. (Tr. 11). Defendant had an intravenous line and a blood pressure cuff attached to his person. (Tr. 11–12; Gov't Ex. 2).

After identifying himself as Red Lake law enforcement officer, CI Sumner approached the side of Defendant's medical bed, and he asked Defendant, "what happened?" (Tr. 12, 16). Defendant initially responded to CI Sumner's questions by asking about the status of the vehicle's passenger to which CI Sumner responded that he did not know about the passenger's status. (Tr. 37). CI Sumner then repeated his question to which Defendant responded that "he was going too fast on Lake Shore" Drive. (Tr. 14, 37). Defendant explained that the was driving approximately 80 to 100 miles per hour when he "hit a patch of ice," "hit a curve, and then hit a tree" before "everything went black." (Tr. 14). When CI Sumner asked Defendant who else was in the vehicle at the time of the incident, Defendant identified the passenger by name. (Tr. 16).

When CI Sumner asked Defendant how long he had been drinking, Defendant stated that he had been drinking since approximately 4:00–6:00 p.m. the previous day. (Tr. 17). Defendant asserted that he had consumed "a lot" of alcohol, including "Yukon 100 proof," as well as, some other bottles throughout the night. (Tr. 19). Defendant said he had been drinking with several people, including R.M.R., Arelia Roy, and Jojo Kingbird. (Tr. 18). Defendant asserted that he

---

[3] CI Sumner testified that at the time of the described interactions he was wearing his uniform with his patrol exterior vest, as well as, his patrol belt which included his firearm on his hip. (Tr. 13).

[4] Government's Exhibit 2 is a copy of a photograph of Defendant in the medical bed. (Gov't Ex. 2). At the Motions Hearing, the Government, without objection, offered the photograph into evidence as Government's Exhibit 2. (Tr. 4).

believed Ms. Kingbird worked at "the jail" which CI Sumner later verified as correct. (Tr. 19). Defendant also spelled "Arelia" in a letter-by-letter pattern for CI Sumner. (Tr. 19).

Defendant also provided CI Sumner with certain information about Defendant's actions immediately following the motor vehicle incident underlying this action. Defendant stated that following the accident he went to two separate residences seeking assistance, the residence of "the Clouds" and the residence of "Bill and Cindy Spears." (Tr. 17). CI Sumner knew from his experience on the Red Lake Indian Reservation that both of the identified residences were at the location of the accident underlying this case. (Tr. 18).

After this initial interaction with Defendant, CI Sumner went to his patrol vehicle to retrieve a blood draw kit to obtain a blood sample from Defendant for later testing. (Tr. 22). CI Sumner returned to Defendant's hospital room. (Tr. 22).[5] CI Sumner orally advised Defendant of his Miranda[6] rights, and CI Sumner asked Defendant if he understood those rights to which Defendant responded in the affirmative. (Tr. 22, 24–25). CI Sumner then asked Defendant if he was willing to consent to a blood draw. (Tr. 22, 24–25). Defendant responded, "I don't think I should. Am I going to jail?" (Tr. 25, 44). CI Sumner did not respond to Defendant's question; instead, CI Sumner repeated his question asking if Defendant was willing to consent to a blood draw. (Tr. 44). Defendant declined to consent to the blood draw. (Tr. 44). CI Sumner responded "okay," and he walked in the direction of the door. (Tr. 26, 44).

As CI Sumner was walking toward the door to exit the room, Defendant stated, "Okay, I give consent for the blood draw or the blood kit." (Tr. 27, 44). A member of the hospital's

---

[5] Upon his return to Defendant's hospital room, CI Sumner observed that the medical staff had temporarily left the room, but at the October 28, 2022, Motions Hearing, CI Sumner testified that the door to the hospital room remained ajar, and the medical staff continued to move in and out of the room. (Tr. 21–22).
[6] Miranda v. Arizona, 384 U.S. 436 (1966).

medical staff then preformed the blood draw. (Tr. 27).[7] The interaction between CI Sumer and Defendant lasted approximately ten to fifteen minutes. (Tr. 22).

Later that same morning, at "a little bit before" 9:30 a.m., Red Lake Criminal Investigator Ron Leyba (hereinafter "CI Leyba") arrived at the Red Lake Hospital. (Tr. 55). After CI Leyba verified the information he had been provided about the motor vehicle accident, he and CI Sumner went to Defendant's hospital room to speak with Defendant and take pictures of Defendant's injuries. (Tr. 56–58). Before entering Defendant's hospital room, CI Leyba activated his audio recorder, and he recorded the entirety of his interaction with Defendant. (Tr. 58–59).[8] When the officers entered Defendant's hospital room, Defendant appeared to be in the same condition as when he first spoke with CI Sumner. (Tr. 57). The officers turned on the light in Defendant's hospital room and observed that the medical staff was no longer in the room. (Tr. 57, 67). During the interaction with Defendant, CI Leyba took at least six pictures of Defendant's person to catalog his injuries. (Tr. 69–71; Def.'s Ex. 1–6).[9]

After CI Leyba and CI Sumner entered Defendant's hospital room, informed Defendant they were going to turn on the light, and turned on the light, the following interaction took place:

> **CI Leyba:** I am going to take some pictures of you. Ok. Of your injuries. Ok.
> **Defendant:** Who, who are you guys?
> **CI Leyba:** I am a criminal investigator with the Red Lake PD. I am also a TFO with the FBI. Ok.
> **Defendant:** 'right. Why do you need this?
> **CI Leyba:** Because I have to take pictures of your injuries, sir. I have to find out what injuries you have, and I am just going to take a couple pictures of you. Ok.
> **Defendant:** How's [R.M.R.]?

---

[7] The blood draw was sent for testing at the Minnesota Department of Public Safety Bureau of Criminal Apprehension. The results of this testing provide that Defendant had an ethyl alcohol concentration of 0.224. (Tr. 45; Gov't's Ex. 3).

[8] CI Leyba was attired in "police pants" and a polo shirt with his badge visible. (Tr. 59–60). He also had his firearm on his hip. (Tr. 60).

[9] Defendant's Exhibits 1–6 are copies of the photographs CI Leyba took of Defendant and his injuries. (Def.'s Exs. 1–6). At the Motions Hearing, Defendant, without objection, offered the photographs into evidence as Defendant's Exhibits 1–6. (Tr. 5).

**CI Leyba:** I don't know. I don't know at this time and stuff. What was going on? Want to tell me what was going on?

**Defendant:** Is she alive?

**CI Leyba:** That I don't know, ok. I can't tell you any information right now sir. Ok.

**Defendant:** 'right

**CI Sumner:** What's your full name and date of birth?

**Defendant:** [provides full name and date of birth]

**CI Leyba:** How old are you?

**Defendant:** [inaudible] 25.

**CI Leyba:** Ok.

**Defendant:** Am I going to prison?

**CI Leyba:** Um. Well, let's start from the beginning here. If you want to talk to me, you can. I do have to advise you of your rights though, ok. I know that [CI Sumner] had already talked to you. So, if you want to talk to me, I'll advise you of your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to a lawyer. If you cannot afford one, one will be appointed to you at no cost. Do you understand each of these rights that I read to you sir?

**Defendant:** Um hm.

**CI Leyba:** Ok. Do you want to tell me what happened tonight or this morning?

(Gov't Ex. 1).[10] Defendant and CI Leyba then discussed the incident underlying the present case, Defendant's relationship with RMR, and the continued care Defendant would be receiving. (Gov't Ex. 1). Although Defendant was tearful throughout the interaction, Defendant responded appropriately to each question asked and his recounting of the incident largely correlated to the information he previously provided to CI Sumner. (Gov't Ex. 1). At the conclusion of the interview, Defendant asked if he could call his mother because he had lost his phone, and CI Leyba told Defendant that he would make arrangement to facilitate Defendant being able to call his mother. (Gov't Ex. 1). CI Leyba then concluded the interview. The whole interaction between CI Leyba and Defendant lasted slightly less than five minutes. (Gov't Ex. 1).

---

[10] Government's Exhibit 1 is a copy of the audio recording of the November 6, 2021, interview involving Defendant, CI Leyba, and CI Sumner. (Gov't Ex. 1). At the Motions Hearing, the Government, without objection, offered the copy of the audio recording into evidence as Government's Exhibit 1. (Tr. 4).

## II.    Government's Motion for Discovery. [Docket No. 14].

The Government seeks discovery pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence. (See Gov't's Mot. for Discovery [Docket No. 14]).

### A.  Inspection and Copying Pursuant to Rule 16(b)

#### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendant to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

Defendant did not object to the request. The motion is granted, and Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 2.  Reports of Examinations and Tests

The Government further requests all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above captioned matter, or copies thereof, within the possession or control of Defendant, which Defendant intends to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Defendant did not object to this request. Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 3.  Expert Testimony

The Government also seeks a written summary of expert testimony Defendant intends to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The

Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons therefore, and the witnesses' qualifications.

The Government requests that such expert disclosures for both parties be made thirty days before trial with rebuttal expert reports being produced no later than ten days before trial. Defendant did not object to this request.

The motion is granted. Defendant shall disclose any such responsive materials for experts he intends to call in his case-in-chief at trial no later than thirty (30) days before trial. Defendant shall disclose any such responsive materials related to rebuttal expert reports no later than ten (10) days before trial.

**B.  Notice of Alibi Defense**

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendant, if he intends to claim alibi as a defense, to state the specific place or places at which Defendant claims to have been at the time of the alleged offenses in the above captioned matter and the names and addresses of the witnesses upon whom Defendant intends to rely to establish such alibi.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) days before trial.

**C.  Notice of Insanity/Mental Illness Defense**

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendant, if he intends to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendant relevant to the issue of guilt, to provide the Government notice of such defense.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) days before trial.

**D.  Public Authority**

Furthermore, pursuant Federal Rule of Criminal Procedure 12.3, the Government seeks an Order from the Court requiring Defendant, if he intends to rely upon the defense of actual or believed exercise of public authority, to notify the Government of the agency involved and the time during which Defendant claims to have acted with public authority.

Defendant did not object to this request. The motion is granted, and Defendant shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) days before trial.

**E. Witness Statements**

The Government seeks all statements within Defendant's possession or control of any witness that Defendant intends to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendant did not object to this request. The motion is granted. To the extent Defendant has statements in his possession or control of any witness that he intends to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendant shall disclose such statements to the Government no later than three (3) business days before such witness is called to testify.

**III.    Defendant's Pretrial Motion for Disclosure of 404(b) Evidence. [Docket No. 20].**

Defendant seeks disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def.'s

Mot. to Disclose 404(b) Evidence [Docket No. 20]). Defendant requests that such disclosure be made no later than three weeks before trial.

In its written response, the Government acknowledged its obligation to comply with Rule 404(b). The Government asserts that it has no objection to disclosure being required three weeks before trial.

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 20], is granted, as set forth herein. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than twenty-one (21) days before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[11]

## IV.    Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 21], and Defendant's Motion for Discovery and Inspection. [Docket No. 23].

Defendant seeks disclosure of any written, recorded, or oral statements made by Defendant or copies thereof in the possession, custody, or control of the Government, as well as, a copy of his criminal history. (See Def.'s Mot. for Discovery [Docket No. 21]). Furthermore, Defendant requests permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government and which are

---

[11] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

material to the preparation of the defense or are intended for use by the Government as evidence in chief at the trial, or were obtained from or belonged to the Defendant. Defendant also requests permission to inspect and copy the results of any physical or mental examinations or scientific tests or experiments.

In his Motion for Discovery of Expert Under Rule 16(a)(1)(G), Defendant requests written summaries of any expert opinion the Government intends to use in its case-in-chief. (Def.'s Mot. [Docket No. 23]). Defendant asserts that said summaries should include expert witnesses' qualifications and opinions, as well as, the basis for those opinions. (Def.'s Mot. [Docket No. 23]).

In its written response to Defendant's Motions, the Government asserts that it has already disclosed certain materials pursuant to Rule 16. The Government further asserts that it will continue to comply with its obligations. The Government requests that the parties' expert disclosures be reciprocal.

Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 21], and his Motion for Discovery and Inspection, [Docket No. 23], are granted, as set forth herein. The Government shall disclose any subsequently acquired materials or information which are specifically responsive to Rule 16 to the Defense as soon as said responsive materials are discovered by the Government and in any event by no later than fourteen (14) days before trial, except with respect to expert disclosures and forensic reports, which shall be disclosed as soon as practicable and in any event by no later than thirty (30) days before trial with rebuttal expert reports to be disclosed no later than ten (10) days before trial.

V.      **Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant. [Docket No. 22].**

Defendant seeks disclosure of evidence favorable to him which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and their progeny. (See Def.'s Mot. to Compel Attorney for the Gov't to Disclose Evid. Favorable to the Def. [Docket No. 22]).

In its written response, the Government acknowledged its duty to disclose responsive materials and information under Brady, Giglio, and their progeny. The Government asserts, however, that Defendant's Motion is now moot because purportedly the Court previously ordered the Government to comply with its obligations under Brady and its progeny. The Government generically objects to Defendant's Motion to the extent it seeks materials beyond the requirements of Brady, Giglio, and their progeny.

The Government is correct in that it has previously been provided notice of its obligations under Brady and its progeny. On August 17, 2022, Defendant appeared before the Honorable Becky R. Thorson for Defendant's initial appearance. (Minutes [Docket No. 7]). The minutes for that hearing indicate that an "[o]ral Rule 5(f) Brady notice" was read on the record; however, the specific contents of that notice are not specified. (Id.). Moreover, on August 18, 2022, the undersigned issued an Order "remind[ing] the United States of its obligation to disclose to the Defendant all exculpatory evidence," including evidence favorable to Defendant which would fall within the authority of Brady and its progeny. (Order [Docket No. 11]).

The mere fact that the Government has been provided notice of its obligation to disclose evidence favorable to Defendant which would fall within the authority of Brady and its progeny does not necessarily moot Defendant's present Motion. As an initial matter, neither notice to the Government of its obligation expressly ordered the Government to comply with said obligation.

Although the contents of the August 17, 2022, oral notice are not on the record now before the Court, the August 18, 2022, Order only reminded the Government of its obligation rather than ordered the Government to comply with said obligation. Moreover, neither notice to the Government of its obligation provided the Government with a deadline by which it was required to comply with said obligation.

Therefore, to the extent it seeks materials responsive to Brady, Giglio, and their progeny, Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 22], is granted, as set forth herein. The Government will disclose any and all remaining and/or subsequently discovered, obtained, or obtainable material responsive to Brady to the Defense as soon as said responsive materials are discovered by the Government.[12] The Government will disclose materials which are responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial by no later than seven (7) days before trial or when the presiding trial judge requires disclosure of trial witnesses, whichever is earlier.[13]

## VI. Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 24].

Defendant seeks an Order of this Court suppressing his November 6, 2021, statements to CI Sumner during the first non-recorded interview, as well as, his November 6, 2021, recorded statements during the interview with CI Leyba and CI Sumner. In support of this request,

---

[12] The Court notes that in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril." Id. Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations.

[13] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

Defendant argues that these statements were obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (Def.'s Mem. [Docket No. 37] at 6–13, 21–25).

### A. Standard of Review

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)). Accordingly, <u>Miranda</u> warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444). "Interrogation under <u>Miranda</u> includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (quoting <u>Rhode Island v. Innis</u>, 466 U.S. 291, 300–01 (1980)); <u>see</u> <u>United States v. McLaughlin</u>, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. <u>United States v. Richardson</u>, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant is entitled to a <u>Miranda</u> warning before custodial interrogation. <u>Miranda</u>, 384 U.S. at 444–45. A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

**B. Discussion**

As observed above, Defendant seeks to suppress the statements he made to law enforcement during both interviews conducted on November 6, 2021, arguing that the statements were procured in violation of <u>Miranda</u>. As for the first interview with only CI Sumner, Defendant argues that the statements should be suppressed because it was a custodial interrogation, and he was not provided a <u>Miranda</u> warning prior to the interrogation. (Def.'s Mem. [Docket No. 37] at 7–13). Regarding the statements he made in the interview with CI Leyba and CI Sumner, Defendant argues that these statements should be suppressed because the interview was a custodial interrogation and although CI Leyba advised Defendant of his rights, Defendant did not voluntarily, knowingly, and intelligently waive his rights. (<u>Id.</u> at 21–25).

To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)); <u>Stansbury</u>, 511 U.S. at 322; <u>Miranda</u>, 384 U.S. at 444. The inquiry into whether a person is in custody for purposes of <u>Miranda</u> "turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave, or in this case, to terminate the interrogation and cause the agent to leave." <u>United States v. New</u>, 491 F.3d 369, 373 (8th Cir. 2007) (internal citations omitted).

It is undisputed that CI Sumner's express questioning of Defendant during the first hospital interview on November 6, 2021, constitutes interrogation. It is further undisputed that CI Sumner did not advise Defendant of his <u>Miranda</u> rights before the initiation of, or at any point during, the first hospital interview on November 6, 2021. Accordingly, the sole issue before the Court regarding Defendant's statements during the first November 6, 2021, interview is whether

Defendant was in custody for the purpose of <u>Miranda</u> during this interview. <u>See</u> <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002) ("[T]he undisputed facts establish that [the officers] were interrogating [the defendant]. To determine whether <u>Miranda</u> rule applies, we must examine whether [the] interrogation was custodial.")

Regarding the second interview of Defendant at the hospital on November 6, 2021, at which CI Leyba and CI Sumner were present, it is undisputed that the officers express questioning of Defendant constitutes interrogation. It is further undisputed that CI Leyba provided Defendant with a <u>Miranda</u> warning. The parties dispute, however, whether Defendant was in custody during the second interview, and the parties also dispute whether Defendant provided a valid waiver of his rights.

Accordingly, the Court must first resolve the threshold issue of whether Defendant was in custody during either of the November 6, 2021, interviews.[14] If Defendant was not in custody during either of the November 6, 2021, interviews, then a <u>Miranda</u> warning was not required prior to either of the interviews and Defendant's Motion to Suppress necessarily fails. <u>See</u> <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002); <u>United States v. Parker</u>, 993 F.3d 595, 601 (8th Cir. 2021), <u>cert. denied</u>, 142 S. Ct. 619 (2021).

The Eighth Circuit has explained:

[W]e outlined six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation. The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning

---

[14] For the purposes of the present <u>Miranda</u> inquiry, there are no material or substantive differences between the circumstances of the two interviews of Defendant at the Red Lake Hospital on November 6, 2021. Thus, for the purposes of the present inquiry, the Court addresses the two interviews concurrently.

was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. We have emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case to present all indicia; and a particular strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Axsom, 289 F.3d at 500–01 (citations omitted). "These factors, however, are not exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (citations and quotation marks omitted). "The analysis depends upon a review of the totality of the circumstances, and [t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir. 2012) (citations and quotations omitted) (alterations in Sanchez).

As for the first factor, the record now before the Court is neutral. Neither CI Sumner during the first interview nor CI Leyba or CI Sumner during the second interview informed Defendant that the questioning was voluntary, that he was free to leave or ask the officers to do so, or that he was not considered under arrest.[15] On the other hand, however, at no point during either interview did the law enforcement officers assert or even imply that the questioning was mandatory or that Defendant was under arrest. On this record, the first mitigating factor is neutral.

Defendant argues that this first factor "supports finding that" Defendant was in custody because the officers failed to inform Defendant that the questioning was voluntary; failed to

---

[15] Although CI Leyba did, throughout the second interview, seek reassurance from Defendant that Defendant was speaking with the law enforcement officers because Defendant wanted to do so, CI Leyba did not seek those assurances until after the interrogation has already begun.

inform him that he was free to leave or ask the officers to do so; and failed to inform him that he was not considered under arrest, despite Defendant asking whether he was going to jail. (Def.'s Mem. [Docket No. 37] at 9). Defendant's argument here is unpersuasive. The mere absence of the assurances found in this first factor does not cause this factor to weigh in favor of finding Defendant to be in custody. United States v. Mattox, No. 18-cr-263 (DWF/ECW), 2019 WL 2343697, at *6 (D. Minn. Apr. 3, 2019), report and recommendation adopted, 2019 WL 2341578 (D. Minn. June 3, 2019), aff'd, 27 F.4th 668 (8th Cir. 2022).

The second factor, which addresses whether Defendant possessed freedom of movement during questioning, weighs in favor finding Defendant was not in custody for the purposes of Miranda. The inquiry here is how it would have objectively appeared to reasonable person in Defendant's position regarding whether his freedom of movement had been restrained "to the degree associated with formal arrest." United States v. Parker, 993 F.3d 595, 603 (8th Cir. 2021) (quoting United States v. Giboney, 863 F.3d 1022, 1028 (8th Cir. 2017)), cert. denied, 211 L. Ed. 2d 386, 142 S. Ct. 619 (2021); see United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008). This inquiry "focus[es] on the restraint imposed by the government agents because '[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.'" United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) (citations omitted); United States v. Axsom, 289 F.3d 496, 506 (8th Cir. 2002) ("Our examination only relates to the restraint imposed by the agents.").

On the record now before the Court, there is no indication that CI Leyba, CI Sumner, or any other government agent took any action which a reasonable person would have felt impeded Defendant's ability to leave the room, terminate the interview, or ask the law enforcement officers to leave the room. Defendant's purported physical inability to leave the room was a

result of his physical injuries not any government action or inaction. On the other hand, there is at least some indication on the record now before the Court that Defendant was aware he possessed the authority to terminate the interactions because when he was later asked to consent to a blood draw, he initially declined to consent to the blood draw thereby causing CI Sumner to begin exiting the room. Thus, the second factor weighs slightly in favor of finding Defendant was not in custody for the purposes of <u>Miranda</u>.

The third mitigating factor, whether the suspect initiated contact with law enforcement or voluntarily acquiesced to the questioning by law enforcement, is present and mitigates against the existence of custody at the time of questioning. In this case, Defendant did not initiate the contact with law enforcement; however, this does not alone render absent the third mitigating factor. <u>United States v. Axsom</u>, 289 F.3d 496, 502 (8th Cir. 2002). The third mitigating factor may also be present if a defendant voluntarily acquiesced to the questioning by law enforcement. The record now before the Court demonstrates that Defendant voluntarily acquiesced to the questions presented by CI Sumner during the first interview on November 6, 2021, as well as, to the questions presented by law enforcement officers during the second interview on November 6, 2021. In his testimony at the October 28, 2022, Motions Hearing, CI Sumner described Defendant as calm throughout the first interview while responding appropriately the questions presented. (Tr. 20–21, 35). Moreover, during the second interview on November 6, 2021, Defendant maintained a cooperative (albeit emotional) demeanor and he responded appropriately to the questions presented. (Gov't's Ex. 1). Nor did Defendant at any point indicate that he wished for the questioning to cease, even after CI Leyba advised Defendant of his rights and re-verified that Defendant was "ok talking" to law enforcement officers. (Gov't's Ex. 1).

The fourth factor, addressing whether law enforcement used strong arm tactics or deceptive stratagems against a suspect during the questioning, does not aggravate in favor of finding that Defendant was in custody during either of the interviews on November 6, 2021. The Court finds no evidence on the present record of strong arm tactics or deceptive stratagems being used against the Defendant during the first or second interview of November 6, 2021. The officers did not display their weapons, nor did they yell at or otherwise threaten Defendant. See Axsom, 289 F.3d at 502 (finding no strong arm tactics where officers "did not adopt a threatening posture toward [defendant], display their weapons, or make a physical show of force during the questioning"); United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993) (finding no strong arm tactics where investigators "did not yell at [defendant], [or] threaten him"). Nor did the officers use any deceptive stratagems, such as the good-cop, bad-cop routine. See Brown, 990 F.2d at 400 (citing "good-cop, bad-cop routine" as example of deceptive stratagem); United States v. Carter, 844 F.2d 368, 372 (8th Cir. 1989). The officers "asked straightforward questions and [Defendant] gave straightforward answers." Axsom, 289 F.3d at 502 (internal quotations omitted). Finally, the officers did not make any promises to Defendant. Thus, the fourth factor does not support a finding of custody.

Defendant conclusorily asserts that this fourth factor weighs in favor of finding he was in custody because the officers failed to provide Defendant with a Miranda warning prior to the first interview, declined to ask Defendant's permission before beginning the questioning, failed to expressly inform Defendant that he could stop the questioning, failed to inform Defendant he was not under arrest, declined to answer Defendant's questions about the health of R.M.R., and declined to inform Defendant that he was a suspect. (Def.'s Mem. [Docket No. 37] at 10–11, 22). In other words, Defendant asserts that the record supports finding the officers utilized strong arm

tactics or deceptive stratagems because the record lacks any evidence that CI Sumner or CI Leyba took any of the actions the Eighth Circuit Court of Appeals has confirmed show a lack of strong arm tactics or deceptive stratagems. (See Id.). The Court finds this assertion unpersuasive. Defendant fails to articulate, and this Court does not find, any legal authority supporting his contention that the lack of these actions in any way indicates he was in custody during either of the interviews on November 6, 2021.

The absence of evidence of strong arm tactics or deceptive stratagems is an adequate basis to conclude that the fourth factor does not aggravate in favor of finding that Defendant was in custody during the two interviews. See, e.g., United States v. Mattox, No. 18-cr-263 (DWF/ECW), 2019 WL 2343697, at *6 (D. Minn. Apr. 3, 2019), report and recommendation adopted, 2019 WL 2341578 (D. Minn. June 3, 2019), aff'd, 27 F.4th 668 (8th Cir. 2022); United States v. Alvarez, No. 4:10-cr-00047-JAJ, 2011 WL 13199206, at *1 (S.D. Iowa May 10, 2011). Law enforcement officers need not take affirmative action to demonstrate the lack of strong arm tactics or deceptive stratagems.

The fifth factor, which addresses whether questioning took place in a "police dominated atmosphere," does not aggravated in favor of finding that Defendant was in custody during the November 6, 2021, interviews. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the [interaction] was police dominated." United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990). Although Defendant was in a private hospital room without direct, immediate access to the support network of his friends and family, the objective evidence demonstrates that neither the atmosphere of the first or second interview of Defendant on November 6, 2021, was so "police dominated" that it resembled formal arrest. See, e.g., Miranda, 384 U.S. at 469;

United States v. Parker, 993 F.3d 595, 603 (8th Cir. 2021). During the first interview with CI Sumner, members of the hospital staff were able to, and in fact did, move in and out of Defendant's hospital room. (Tr. 23, 33–34). Although it does not appear that any members of the hospital staff moved in and out of the room during the second interview of Defendant with CI Leyba and CI Sumner, that interaction lasted less than five minutes, and there is no indication on the record now before the Court that law enforcement officers took any action to prevent members of the medical staff from entering Defendant's hospital room during that time.

Notably, under circumstances materially analogous to the present case, the Eighth Circuit Court of Appeals has determined that a hospital room where hospital staff may come and go from the room cannot "be fairly described as 'police dominated,'" even when a defendant's physical condition or injuries render him immobile. United States v. New, 491 F.3d 369, 373 (8th Cir. 2007). Other Courts in this District have reached this same conclusion. See, e.g., United States v. Mattox, No. 18-cr-263 (DWF/ECW), 2019 WL 2343697, at *6 (D. Minn. Apr. 3, 2019); see also United States v. Alvarez, No. 4:10-cr-00047-JAJ, 2011 WL 13199206, at *1 (S.D. Iowa May 10, 2011).

Additionally, the unrefuted evidence in the record, including CI Sumner's testimony about the first interview and the audio recording of the second interview, demonstrates that CI Sumner and CI Leyba, at all times, maintained a conversational tone and volume which counsels against finding the atmosphere to be "police dominated" to a level commensurate with formal arrest. (Tr. 15; Gov't's Ex. 1). Moreover, the first interview lasted only ten to fifteen minutes and the second interview lasted less than five minutes, which weighs against a finding that the interviews were "police-dominated" to a level resembling formal arrest. United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005) (noting that when an interview is "not lengthy," it

counsels against a finding that the interview was "police-dominated" and citing to cases involving a seven-hour interview and a ninety-eight-minute interview—neither of which were determined to be of sufficient length to render the interaction custodial); see also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding six-hour interview did not render confession involuntary).

Lastly, the sixth factor, addressing whether Defendant was arrested at the end of the interview, fails to aggravate in favor of finding that Defendant was in custody during either the first or second interview on November 6, 2021. In the present case, Defendant was in fact not arrested upon the conclusion of either of the two at issue interviews on November 6, 2021.[16] Likewise, at no time before, during, or after the interviews was Defendant ever even handcuffed by law enforcement officers. At the conclusion of his first interview, CI Sumner left Defendant's hospital room. At the end of the second interview, CI Sumner and CI Leyba left Defendant's hospital room.

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the first interview with CI Sumner on November 6, 2021, and as such, Defendant was not in custody during the first November 6, 2021, interview with CI Sumner. Similarly, the Court concludes that, upon consideration of the totality of the circumstances, a reasonable person in Defendant's position would have objectively felt free to terminate the second interview on November 6, 2021,

---

[16] In his memorandum, Defendant speculates that he was not arrested at the end of either interview because the officers knew he "required a higher level of medical care and would be sent to Bemidji-Sanford Medical Center later that day." (Def.'s Mem. [Docket No. 37] at 12). Defendant's speculation is, however, wholly unsupported by the record. Although CI Sumner and CI Leyba both provided testimony indicating that they were each aware that Defendant was going to be sent to a different facility for additional care, the record lacks any indication that this need for additional medical care contributed in any way to whether Defendant would be arrested.

and as such, Defendant was not in custody during the second November 6, 2021, interview involving CI Sumner and CI Leyba. Thus, law enforcement officers were not constitutionally required to provide Defendant with a <u>Miranda</u> warning prior to either of the interviews.[17]

This does not, however, end this Court's inquiry. Even non-custodial statements made to law enforcement may be suppressed if the statements were not voluntarily made to law enforcement. <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1040 (8th Cir. 2005).

In regard to non-custodial statements to law enforcement, the Eighth Circuit Court of Appeals has established the following:

> A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination. We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.

(<u>Id.</u>). That said, a statement cannot be rendered involuntary by the impaired capacity of the defendant alone; coercive police activity is a necessary requirement to finding a defendant's statement to be involuntary. <u>Colorado v. Connelly</u>, 479 U.S. 157, 164 (1986). The Government must demonstrate that a defendant's statements were voluntary by a preponderance of the evidence. <u>United States v. Brave Heart</u>, 397 F.3d 1035, 1040 (8th Cir. 2005).

In this case, the Government has met its burden of demonstrating by a preponderance of the evidence that Defendant's statements made during the two interviews on November 6, 2021, were voluntarily made. Along with the reasons discussed above, other factors demonstrate that the Government has met its burden here.

---

[17] Because the Court concludes that Defendant was not entitled to a <u>Miranda</u> warning before the second interview on November 6, 2021, the Court does not consider the parties' arguments related to whether Defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights when those rights were provided to him by CI Leyba at the start of the second interview.

First, for all the reasons discussed above, the record is devoid of any indication that CI Sumner's or CI Leyba's conduct amounted to coercive police conduct. Put differently, the record now before the Court lacks any indication that Defendant's statements during the two November 6, 2021, interviews were the product of any coercive activity by CI Sumner, CI Leyba, or any other government agent.

Second, Defendant is an adult above the age of majority with no indication that he has any difficulty in speaking and understanding English, nor that his intelligence rendered him in any way incapable of providing consent. The record demonstrates that Defendant was an adult of at least average intelligence given his ability to respond appropriately to the questions presented at the two interviews by CI Sumner and CI Leyba. Nothing in the record indicates that there were any signs that Defendants intelligence was such that it rendered him incapable of providing consent. These considerations support finding Defendant's statements to be voluntary. United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005).

Moreover, while Defendant informed CI Sumner and CI Leyba that he had been drinking for several hours preceding the accident and both CI Sumner and CI Leyba recognized that Defendant's speech was slurred, the mere fact that an individual was under the influence of drugs or alcohol does not mean he cannot provide voluntary consent. United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008); United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006) (holding that while defendant "may have been under the influence of methamphetamine at the time of his arrest, [ . . .] the evidence does not suggest that he was so intoxicated that he was not 'competent to understands the nature of his acts.'") (citing United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986)). There is nothing in the record now before the Court to indicate that CI Sumer was aware that Defendant was intoxicated at such a level that it would render him

unable to competently understand the nature of his actions. See, e.g., Willie, 462 F.3d at 896, United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (finding waiver of rights was not involuntary even though the defendant had consumed alcohol along with pain killers, muscle relaxants, and a mixture of cocaine and marijuana several hours before waiving his rights, because two agents testified that the defendant "appeared awake and coherent," and the defendant "did not tell them that he was tired, intoxicated or under the influence of drugs"); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (finding that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his rights pursuant to Miranda where police officers testified that they had no knowledge of these impairments and he did not act intoxicated). Indeed, Defendant's emotional nature in the second interview when asking whether R.M.R. had survived the crash indicates, at least in part, that he was aware of the nature and consequences of his actions and the ongoing circumstances.

Moreover, the persuasiveness of any argument that Defendant was intoxicated to such a level that it would render him unable to competently understand the nature of his actions is greatly diminished by CI Sumner's unrebutted testimony providing that Defendant was able to understand the questions presented to him, remained awake and conscious throughout the interviews, was able to communicate in an understandable manner, and responded appropriately to the questions presented. The Court's review of the audio recording of the second interview corroborates this testimony. Any argument that Defendant's intoxication reached a level rendering him unable to competently understand the nature of his actions is further militated by CI Sumner's testimony that Defendant was able to accurately recall several details in response to the question presented to him, including the specific location of the motor vehicle accident underlying the present case; the names of the persons residing at the residences where he sought

assistance; and the names of the persons with whom he had been drinking to include providing the spelling of at least one name and the employment location of another individual.

Moreover, the record now before the Court also indicates that Defendant has at least some level of prior experience with the criminal justice system. This too weighs in favor of finding Defendant's statements during the two at issue interviews to have been voluntarily made. United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005).

Upon consideration of the totality of the circumstance, including Defendant's own words and actions, the Court concludes that Defendant's statements made during the two interviews on November 6, 2021, were voluntarily made.

In summary, Defendant was not in custody for the purposes of Miranda during either the first or second interview on November 6, 2021, and Defendant's statements during the two at issue interviews were voluntarily made. Consequently, Defendant is not entitled to have the statements he made during these interviews suppressed pursuant to Miranda.

Therefore, to the extent Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], seeks an Order of this Court suppressing Defendant's statements made during the first or second interview on November 6, 2021, the undersigned recommends that Defendant's Motion to Suppress Statements, Admissions, and Answer, [Docket No. 24], be **DENIED**.

## VII.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 25].

Defendant also seeks an Order of this Court suppressing evidence obtained from the November 6, 2021, blood draw conducted by a member of the Red Lake Hospital staff at the direction of CI Sumner. (Def.'s Mot. [Docket No. 25]; Def.'s Mem. [Docket No. 37] at 13–21). In support of this request, Defendant asserts that he did not provide valid, voluntary consent for

the blood draw, and there did not exist exigent circumstances to warrant the blood draw without his valid, voluntary consent. (Def.'s Mem. [Docket No. 37] at 13–21).

In the present case, it is undisputed that the blood draw was obtained without a warrant, and the Government has raised no assertion that probable cause existed to obtain the blood draw. It is also undisputed that CI Sumner provided Defendant with a <u>Miranda</u> warning immediately before asking Defendant if he was willing to consent to the blood draw, and it is likewise undisputed that Defendant affirmatively consented to the blood draw. Thus, the issue the Court must decide is whether Defendant voluntarily consented to the blood draw.

Defendant now argues that any consent he gave was not "valid consent" based on the totality of the circumstances present. (Def.'s Mem. [Docket No. 37] at 13–21). Defendant reasons that he was unable to "validly consent" because he "was under the influence of alcohol at the time" as demonstrated by the fact that he "slurred his words and mumbled" and his blood-alcohol concentration was 0.224; he "had just been involved in a serious crash"; he asked "who are you guys" when CI Leyba and CI Sumner entered the room for the second interview even though he had already met CI Sumner; he initially refused consent to the blood draw; the officers declined to specifically inform Defendant he would not be arrested; and he was "in custody." (<u>Id.</u>). The Court finds each of these arguments, individually and considered as a whole, to be unpersuasive.

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." <u>United States v. Davis</u>, 569 F.3d 813,

816 (8th Cir. 2009) (citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). "Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement." <u>United States v. Golinveaux</u>, 611 F.3d 956, 959 (8th Cir. 2010). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." <u>United States v. Pennington</u>, 287 F.3d 739, 746 (8th Cir. 2002) (internal quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." <u>United States v. Williams</u>, 521 F.3d 902, 906 (8th Cir. 2008). In determining whether an individual has expressed consent, "[t]he precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." <u>United States v. Jones</u>, 254 F.3d 692, 695 (8th Cir. 2001) (citing <u>United States v. Sanchez</u>, 32 F.3d 1330, 1333–35 (8th Cir. 1994)).

Importantly, consent must be voluntarily given. An inquiry into the voluntariness of consent "turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual." <u>United States v. Zamoran-Coronel</u>, 231 F.3d 466, 469 (8th Cir. 2000); <u>see</u> <u>United States v. Quintero</u>, 648 F.3d 660, 667 (8th Cir. 2011); <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000). "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given, but awareness of the right to refuse is not necessary for consent to be voluntary." <u>United States v. Arciniega</u>, 569 F.3d 394, 398 (8th Cir. 2009) (quoting <u>United States v. Smith</u>, 260 F.3d 922, 924 (8th Cir. 2001)).

Relevant factors regarding the individual allegedly providing consent include:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was

> informed of [his] <u>Miranda</u> rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

<u>United States v. Golinveaux</u>, 611 F.3d 956, 959 (8th Cir. 2010). The Court should also consider the environment in which the individual's consent was obtained including:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

<u>Id.</u> These "factors are valuable as a guide to analysis," however, "these factors should not be applied mechanically." <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990).

The mere fact that an individual was under the influence of drugs or alcohol does not mean he is unable to provide voluntary consent. <u>United States v. Castellanos</u>, 518 F.3d 965, 969 (8th Cir. 2008) ("[T]he mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary."). Instead, in determining whether consent was voluntary, the relevant question is whether the individual had "a reasonable appreciation of the nature and significance of his actions" or whether his will had been overborne and his capacity for self-determination critically impaired. <u>United States v. Saenz</u>, 474 F.3d 1132, 1136 (8th Cir. 2007); <u>see</u> <u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011).

Based on the totality of the circumstances in this case, the Court concludes that Defendant's consent to the blood draw was voluntarily given. As discussed above, the record now before the Court—when considered in light of the relevant individual and environmental factors on November 6, 2021—is devoid of any indication of coercive police activity by CI Sumner or CI Leyba during either of the two November 6, 2021, interviews or the blood draw interaction between CI Sumner and Defendant. This lack of coercive police activity necessarily

renders voluntary Defendant's consent to the blood draw. See, e.g., Colorado v. Connelly, 479 U.S. 157, 167 (1986) (explaining that a statement is not involuntary because of incapacity of the defendant in the absence of some coercive police activity); United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987); Gingras v. Weber, 543 F.3d 1001, 1003 (8th Cir. 2008); United States v. Bennett, No. 8:07-cr-235, 2007 WL 4616368, at *3 (D. Neb. Dec. 28, 2007); United States v. Williams, 760 F.3d 811, 815 (8th Cir. 2014).

In an abundance of caution, however, the Court will consider the other relevant factors in determining whether Defendant's consent to the blood draw was voluntary.

First, regarding factors relevant to Defendant's characteristics, these factors support the Court's conclusion that Defendant voluntarily consented to the blood draw. Defendant is an adult above the age of majority with no indication that he has any difficulty in speaking and understanding English, nor that his intelligence rendered him in any way incapable of providing consent. The record demonstrates that Defendant was an adult of at least average intelligence given his ability to respond appropriately to questions presented. Nothing in the record suggests that there were any signs on November 6, 2021, that Defendant's intelligence was such that it rendered him incapable of providing consent. While Defendant had sustained injuries as a result of the vehicle crash, nothing in the record demonstrates that his injuries affected his mental or cognitive ability.

While the record now before the Court demonstrates that Defendant was intoxicated at the time he consented to the blood draw, the mere fact that an individual was under the influence of drugs or alcohol does not mean he cannot provide voluntary consent. Castellanos, 518 F.3d at 969; United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006) (holding that while defendant "may have been under the influence of methamphetamine at the time of his arrest, [ . . .] the

evidence does not suggest that he was so intoxicated that he was not 'competent to understand the nature of his acts.'") (citing United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986)). There is nothing in the record now before the Court to indicate in any way that Defendant was intoxicated at such a level that it would render him unable to competently understand the nature of his actions. See Willie, 462 F.3d at 896. Moreover, other Courts with evidence of a greater degree of intoxication have found that the voluntariness was not militated against by the defendant's level of intoxication. See, e.g., United States v. Gaddy, 532 F.3d 783, 788 (8th Cir. 2008) (finding waiver of rights was not involuntary even though the defendant had consumed alcohol along with pain killers, muscle relaxants, and a mixture of cocaine and marijuana several hours before waiving his rights, because two agents testified that the defendant "appeared awake and coherent," and the defendant "did not tell them that he was tired, intoxicated or under the influence of drugs"); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (finding that a suspect who recently used methamphetamine and had not slept for five days voluntarily waived his rights pursuant to Miranda where police officers testified that they had no knowledge of these impairments and he did not act intoxicated).

Defendant was also informed of his Miranda rights by CI Sumner before Defendant consented to the blood draw, and Defendant affirmatively acknowledge that he understood his rights. Defendant being advised of his Miranda rights and affirmatively acknowledging that he understood those rights before he consented to the blood draw weighs heavily in favor of finding that his consent was voluntary. See, e.g., United States v. Mendenhall, 446 U.S. 544, 558 (1980); United States v. Steinmetz, 900 F.3d 595, 599 (8th Cir. 2018); United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008).

The record now before the Court also demonstrates that Defendant had a least some previous experience and interaction with the criminal justice system, including circumstances for which he would have been arrested and provided with a Miranda warning. (Tr. 29). This too favors finding Defendant's consent to be voluntary. Brave Heart, 397 F.3d at 1041; United States v. Gallegos, No. 20-cr-233 (JRT/BRT), 2022 WL 2442597, at *5 (D. Minn. Feb. 23, 2022), report and recommendation adopted, 2022 WL 1799386 (D. Minn. June 2, 2022).

In summation, an evaluation of Defendant's characteristics relevant to the factors enumerated by the Eighth Circuit Court of Appeals supports the conclusion that Defendant's consent to the blood draw at issue was voluntary.

As for the environmental factors relevant to Defendant's consent, these factors also support the Court's conclusion that Defendant's consent to the blood draw was voluntary. First, as explained above, the record lacks any indication that CI Sumner, CI Leyba, or any other law enforcement officer used any threats, physical intimidation, or punishment to extract consent from Defendant. Nor is there any indication in the record that CI Sumner, CI Leyba, or anyone else made any promises or misrepresentations to Defendant in order to obtain Defendant's consent to the blood draw.

The environmental factor related to the length of the detention and custody also support finding that Defendant's consent was voluntarily provided. CI Sumer's interview of Defendant prior to Defendant consenting to the blood draw was only ten to fifteen minutes. See, e.g., United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005) (finding a confession voluntary when procured after an interview lasting two hours); United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding six-hour interview did not

render confession involuntary). Furthermore, Defendant was not placed under arrest at any point on November 6, 2021, and for all the reasons articulated above, Defendant was not in custody at the time he consented to the blood draw.

The record is not entirely clear as to whether consent was given in public or in an area secluded by law enforcement. The parties agree that Defendant was in a "private" hospital room; however, this appears to mean only that he was the sole patient in the room. Although CI Sumner provided testimony that members of the hospital staff were in the room during portions of the interview and able to come in and out of the room as needed, the record does not clearly demonstrate whether a member of the staff was in the room at the time Defendant consented to the blood draw. CI Sumner provided some testimony indicating that there were not hospital staff members in the room at the exact time Defendant consented to the blood draw; but CI Sumner also provided seemingly conflicting testimony indicating that when Defendant consented to the blood draw there was already a member of the hospital staff in the room to preform the blood draw. In any event, the record affirmatively demonstrates that the door to Defendant's hospital room remained open during CI Sumner's initial interview with Defendant and at the time Defendant consented to the blood draw. (Tr. 23). Under the circumstances of this case, the Court finds that Defendant's consent given in his "private" hospital room with an open door and hospital staff coming and going from the room cannot be reasonably described as having occurred in a "secluded location" sufficient to render his consent involuntary. Under similar circumstances, other Courts considering the voluntariness of a person's consent to a blood draw in a hospital setting have found that such a setting does not obviate the voluntariness of a person's consent to a blood draw. See, e.g., United States v. Dow, No. 10-cr-65 (MJD/RLE),

2010 WL 2679942, at *8 (D. Minn. June 11, 2010), report and recommendation adopted, 2010 WL 2679955 (D. Minn. June 30, 2010).

The environmental factor asking whether the individual stood by silently or objected to the search likewise supports this Court's conclusion that Defendant's consent to the blood draw was voluntary. There is nothing in the record indicating that, after giving verbal assent, Defendant did anything besides silently cooperate while the blood draw was actually performed. This supports the Court's conclusion that Defendant's consent was voluntary. United States v. Dow, No. 10-cr-65 (MJD/RLE), 2010 WL 2679942, at *8 (D. Minn. June 11, 2010) (noting that the defendant was cooperative during the blood draw without voicing any objection to the blood draw or attempting to stop hospital staff from conducting the blood draw and finding that "by cooperating with hospital staff, the Defendant manifested his voluntary consent to the blood draw"); United States v. Deserly, No. 17-cr-217 (WMW/LIB), 2017 WL 8787046, at *6 (D. Minn. Dec. 5, 2017), report and recommendation adopted, 2018 WL 740386 (D. Minn. Feb. 7, 2018); United States v. Ramsey, 711 F.2d 104, 107–08 (8th Cir. 1983) (affirming the District Court's finding that the defendant had consented to the blood draw where a doctor informed him that the police had requested a blood sample and where the testimony reflected that he had acquiesced to the request by holding out his arm and watching the technician clean his arm); see also United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990) (finding that opening up the trunk for law enforcement supported the conclusion that the defendant voluntarily consented to the search reasoning that "[t]his type of cooperation evinces voluntariness"); United States v. Smith, 260 F.3d 922, 925 (8th Cir. 2001) (finding that, even if defendant had not orally consented, he had "at the very least . . . indicated his consent to the search by raising his hands").

Moreover, Defendant's initial refusal to consent to the blood draw is evidence that his will was not overborne by the relevant factors surrounding his subsequent consent to the blood draw. See, e.g., United States v. Pape, 917 F. Supp. 2d 888, 897 (D. Minn. 2013); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990); United States v. Gallegos, No. 20-cr-233 (3) (JRT/BRT), 2022 WL 1799386, at *5 (D. Minn. June 2, 2022); United States v. Thompson, No. 14-cr-302 (DWF), 2015 WL 144882, at *11 (D. Minn. Jan. 12, 2015); United States v. Salazar, No. 16-cr-264 (SRN/HB), 2017 WL 1365110, at *5 (D. Minn. Mar. 23, 2017), report and recommendation adopted, 2017 WL 1365976 (D. Minn. Apr. 12, 2017); United States v. Yellow, No. 17-cr-282 (MJD/LIB), 2018 WL 1189340, at *7 (D. Minn. Feb. 6, 2018), report and recommendation adopted, 2018 WL 1193059 (D. Minn. Mar. 7, 2018); United States v. Clausen, No. 16-cr-256 (MJD/LIB), 2017 WL 1483525, at *8 (D. Minn. Feb. 27, 2017), report and recommendation adopted, 2017 WL 1483392 (D. Minn. Apr. 25, 2017).

The totality of the circumstance in the present case indicates that Defendant's consent to the blood draw was voluntarily given, and as a result, all evidence obtained as a result thereof was lawfully seized without any violation of Defendant's Fourth Amendment rights.

Therefore, the Court recommends Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25], be **DENIED**.

## VIII.   Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.  The Government's Motion for Discovery, [Docket No. 14], is **GRANTED**, as set forth herein;

2. Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 20], is **GRANTED**, as set forth herein;

3. Defendant's Motion for Discovery of Expert Under Rule 16(a)(1)(G), [Docket No. 21], is **GRANTED**, as set forth herein;

4. Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 22], is **GRANTED**, as set forth herein; and

5. Defendant's Motion for Discovery and Inspection, [Docket No. 23], is **GRANTED**, as set forth herein.

Furthermore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], be **DENIED**; and

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 25], be **DENIED**.

Dated: January 13, 2023                              s/Leo I. Brisbois
                                                     Hon. Leo I. Brisbois
                                                     U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.