# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

     Plaintiff,

vs.                          **MEMORANDUM OF LAW AND ORDER**
                                 Crim. No. 22-135 (MJD/LIB)

Gerald Wayne Johnson,

     Defendant.

_____

Alexander D. Chiquoine and Joseph Scott Teirab, Assistant United States Attorneys, Counsel for Plaintiff.

Douglas Olson and Matthew Deates, Office of the Federal Defender, Counsel for Defendant.

_____

     This matter is before the Court on the Report and Recommendation by United States Magistrate Judge Leo I. Brisbois, dated January 13, 2023.  (Doc. 40 ("the R&R").)  Defendant filed extensive objections to the Report and Recommendation.  (Doc. 43.)  The Government did not object to the Report and Recommendation.

     Pursuant to statute, the Court has conducted a de novo review of the record.  28 U.S.C. § 636(b)(1); D. Minn. LR 72.2(b).  Based on that review and in

1

consideration of the applicable law, the Court adopts in part and modifies in part

the Report and Recommendation dated January 13, 2023.

## I.      THE REPORT AND RECOMMENDATION

The Magistrate Judge recommends that Defendant's motion to suppress

statements be denied because Defendant was not in custody for <u>Miranda</u>[1]

purposes during either of two interviews with law enforcement.  (R&R at 13-27.)

The Magistrate Judge also held that evidence seized as a result of a blood draw

need not be suppressed because Defendant voluntarily consented to the blood

draw.  (<u>Id.</u> at 27-36.)

## II.     FACTUAL BACKGROUND

For a full recitation of the facts, the Court refers to the R&R.  (<u>Id.</u> at 2-6.)

Briefly, at 8:04 a.m. on November 6, 2021, Sergeant Christopher Sumner of the

Red Lake Police Department ("CI Sumner")[2] went to the Red Lake Hospital after

visiting the scene of a single-car motor vehicle accident.  (Suppression Hr'g

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[2] Sergeant Sumner has been promoted to Criminal Investigator since the time
detailed in these facts.  (Hr'g Tr. at 6.)  The R&R refers to him as "CI Sumner."
For consistency, the Court will do the same.

Transcript ("Hr'g Tr.") at 10.)  When he arrived at the hospital, CI Sumner was

informed that the vehicle's sole passenger, R.M.R., had been pronounced dead at

7:58 a.m. and that Defendant, the driver of the vehicle, was receiving care at the

hospital.  (Id.)  CI Sumner testified that at that point, he wanted to ask Defendant

questions because he was now the suspect in a homicide.  (Id. at 32.)

When CI Sumner entered Defendant's hospital room, Defendant was on

his back in a slightly-elevated hospital bed, was wearing a C-collar, and was

hooked up to an IV and a blood pressure cuff.  (Id. at 11–12; Gov't Ex. 2.)

Defendant had blood on his hands, arms, face, and shirt and there were one or

two healthcare staff in the room tending to him.  (Hr'g Tr. at 11, 35; Def. Ex. 2-6.)

The room had an open glass door and medical staff were going in and out of the

room.  (Hr'g Tr. at 23.)  Defendant was not handcuffed or restrained in any way

other than by the medical equipment.  (Id. at 12.)  CI Sumner was wearing his

police uniform and had his firearm on his belt but never removed it or any other

weapons from their holsters.  (Id. at 13.)

After identifying himself as a Red Lake law enforcement officer, CI

Sumner approached the side of Defendant's bed, and asked, "What happened?"

3

(Id. at 12, 16.)  Defendant responded by asking about R.M.R.'s status.  (Id. at 36-37.)  CI Sumner stated that he did not know her status.  (Id. at 37.)  CI Sumner then repeated his question, to which Defendant responded that "he was going too fast on Lake Shore" Drive.  (Id. at 14, 37.)  Defendant then explained in some detail that he and R.M.R. had been drinking for hours prior to the accident and provided the names of their drinking companions and the names of the places he went for help after the accident.  (Id. at 17-19.)  Defendant was awake and, although groggy, never fell asleep; was slurring his words and mumbled but was understandable; and provided appropriate answers that related to the questions he was asked.  (Id. at 20, 39.)  Defendant was emotional and nearly crying when he asked about R.M.R.  (Id. at 21.)  CI Sumner's interaction with Defendant lasted approximately 10-15 minutes.  (Id. at 22.)

CI Sumner then went to his patrol vehicle, retrieved a blood draw kit, returned to Defendant's hospital room, and gave Defendant an oral Miranda warning.  (Id. at 24.)  CI Sumner asked Defendant if he understood his rights; Defendant responded in the affirmative.  (Id. at 22, 24–25.)  CI Sumner then asked if Defendant consented to a blood draw.  (Id. at 22, 24–25.)  Defendant

responded, "I don't think I should. Am I going to jail?" (Id. at 25.) CI Sumner

did not respond to the question, but instead asked again if Defendant consented

to a blood draw. (Id. at 44.) Defendant again declined consent. (Id.) CI Sumner

responded, "Okay," and walked toward the hospital room door. (Tr. 26, 44.) As

CI Sumner walked toward the door, Defendant stated, "Okay, I give consent for

the blood draw or the blood kit." (Id.) A member of the hospital's medical staff

then performed the blood draw. (Id. at 27.) Testing revealed that Defendant had

a blood alcohol concentration ("BAC") of .224. (Id. at 45.)

Later that morning, shortly before 9:30 a.m., Red Lake Criminal

Investigator Ron Leyba ("CI Leyba") arrived at the hospital. (Id. at 55.) He and

CI Sumner went to Defendant's hospital room to speak with Defendant and take

pictures of his injuries. (Id. at 56–58.) CI Leyba made an audio recording of his

entire interaction with Defendant. (Gov. Ex. 1.) When the officers entered

Defendant's hospital room, Defendant appeared to be resting and in the same

condition as when he first spoke with CI Sumner. (H'rg Tr. at 57.) The officers

turned on the light in the room and observed that medical staff was no longer in

the room. (Id. at 6-67.) CI Leyba took at least six pictures of Defendant's person

5

to catalog his injuries.  (<u>Id.</u> at 69–71; Def. Ex. 1–6.)  CI Sumner gave Defendant a verbal <u>Miranda</u> warning and Defendant agreed to speak to him.  Their entire interview is captured on Government's Exhibit 1.

Although Defendant does not object to the recitation of this conversation in the R&R, that recitation does not include information Defendant relies on to make objections.  (Doc. 43 at 20.)  The Court therefore <u>sua sponte</u> modifies the R&R's recitation of a portion of the interview between Defendant and CI Leyba contained in Government's Exhibit 1, as shown in bold and underlined lettering and adopts the Magistrate Judge's statement of facts in all other respects.

   . . .

| | |
|---|---|
| CI Leyba: | How old are you? |
| Defendant: | [inaudible] I'm 25. |
| CI Leyba: | Twenty-five.  **<u>Does your head hurt?</u>** |
| Defendant: | **<u>Yeah, I guess.</u>** |
| CI Leyba: | **<u>Okay.</u>** |
| Defendant: | Am I, am I going to prison? |

(Gov. Ex. 1 at 1:24-1:39.)

## III.   DEFENDANT'S OBJECTIONS

Defendant objects to several findings in each of the analyses in the R&R and objects to the ultimate conclusions reached by the R&R.  (Doc. 43.)

### A.   Defendant's Objections Regarding the R&R's Custody Analysis

6

The R&R concludes that Defendant was not in custody for <u>Miranda</u> purposes for either interview. Defendant objects to the R&R's findings on each of the six factors from <u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir. 1990) the R&R analyzed to reach that decision. The Court will sustain Defendant's objection to the R&R's finding on the first <u>Griffin</u> factor and overrule Defendant's objections on the other factors.

The R&R found that the first <u>Griffin</u> factor was neutral because although neither CI Sumner during the first interview nor CI Leyba during the second interview of Defendant informed him that questioning was voluntary, neither officer asserted or even implied that questioning was mandatory or that Defendant was under arrest. (R&R at 17.) However, the Court finds that the first <u>Griffin</u> factor weighs in favor of custody when a defendant is not informed he is free to leave, under arrest, or free to terminate the interview. <u>See</u> <u>United States v. Johnson</u>, 39 F.4th 1047, 1051 (8th Cir. 2022). Even <u>United States v. Mattox</u>, the case upon which the R&R relied, found that the first factor weighed in favor of custody because the officer conducting the interview did not inform the defendant "at the outset that the questioning was voluntary." No. 18-cr-263

(DWF/ECW), 2019 WL 2343697, at *6 (D. Minn. Apr. 3, 2019) (finding this to be one of two factors weighing in favor of custody while ultimately holding that the defendant was not in custody for <u>Miranda</u> purposes).  The R&R will be modified accordingly.

The other factors all weigh against custody and Defendant's objections to the R&R's findings on those factors are overruled.  The Court will discuss Defendant's arguments because doing so will efficiently dispatch arguments he makes on other issues.

First, Defendant's argument that law enforcement "should not be permitted to make use of [restraints placed on defendants to render medical treatment] to seek unwarned admissions from [them]" is misplaced.  The law is clear that even in the healthcare setting, courts "focus on the restraint imposed by the government agents because the sole concern of the Fifth Amendment, on which <u>Miranda</u> was based, is governmental coercion."  <u>United States v. New</u>, 491 F.3d 369, 373 (8th Cir. 2007) (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986); <u>United States v. Erving L.</u>, 147 F.3d 1240, 1247 (10th Cir. 1998)) (cleaned up).  Here, there is no evidence that the officers took any action which a

reasonable person would have felt impeded his ability to leave the room,

terminate the interviews, or tell the officers to leave the room.

Second, evidence also supports the R&R's finding that Defendant

voluntarily acquiesced to CI Sumner's questions during the first interview.

There is no evidence that Defendant only answered questions after CI Sumner

"repeatedly refused to answer" his questions about R.M.R.'s condition.  (Doc. 43

at 7.)  CI Sumner's testimony on cross-examination was that he asked Defendant

what happened and instead of answering, Defendant asked about R.M.R.  (Hr'g

Tr. at 36-37.)  Instead of telling Defendant that R.M.R. had died, CI Sumner again

asked what happened and Defendant said he had been driving too fast.  (Id. at

37.)  This does not evidence unacceptable repeated questioning and is

distinguishable from the situation in United States v. Quintero, 648 F.3d 660 (8th

Cir. 2011), upon which Defendant relies.  In Quintero, a sheriff, accompanied by

three other officers and two hotel security guards, misrepresented his identity at

a hotel room door; commanded the sleeping defendant to get dressed and come

to the door multiple times; and repeatedly badgered her for consent to search the

room over a period of several minutes despite her hesitation and "her statements

to the effect that the three officers were 'scaring the shit out of [her].'"  648 F.3d at 670.

Third, the Court's de novo review shows that CI Sumner did not rely on Defendant's vulnerable mental and physical condition to obtain admissions about the crash.  (Doc. 43 at 8.)  Both he and CI Leyba used conversational tones; did not raise their voices, use their weapons, make threats or promises, use deceptive tactics or stratagems; and both stated that although Defendant slurred his speech, he followed conversations and answered questions appropriately. The Court further finds that although Defendant became tearful when asking about R.M.R., that, too, was the appropriate reaction of someone concerned about a friend who was "like a sister" to him.  There is no indication that CI Sumner "seized upon" Defendant's condition before "subjecting" him to questioning.  Contrary to Defendant's argument, the R&R correctly found there was no evidence "of strong arm tactics or deception stratagems being used against Defendant" during either interview.  (R&R at 20.)

Fourth, although Defendant argues that the R&R incorrectly decided that the atmosphere surrounding the first interview was not police dominated

because CI Sumner was in uniform and Defendant did not have his cell phone or family and friends with him (Doc. 43 at 9), his major objection to the R&R's finding that the interviews were not police dominated is that the first interview was "entirely one-sided" because CI Sumner asked questions without answering Defendant's questions regarding R.M.R. and whether he was going to jail. Defendant also reiterates his argument that CI Sumner "repeatedly" asked his questions about the crash until he obtained an answer.  (Id. (citing Hr'g Tr. at 37).)  Defendant additionally argues that the R&R relied too heavily on the short duration of the two interviews and the fact that the room was not closed to medical staff, which he asserts distinguishes this case from New, upon which the R&R relied.  (Id. at 9-10 (citing cases that Defendant argues the R&R relied on but that are actually distinguishable because in those cases, in addition to relying to the short duration of the interviews, the officers also told the defendants participation was voluntary).)

While CI Sumner's uniform and Defendant's lack of cell phone and a support system are considerations, they are not dispositive factors under the facts of this case and, indeed, are common facts presented in many cases.  Here,

although CI Sumner was in uniform, there is no evidence he reached for, mentioned, or acknowledged his firearm, taser, nightstick or handcuffs or threatened to do so. Defendant did not ask about a phone or family member during the interview with CI Sumner. CI Sumner's unrebutted testimony is that healthcare professionals were in and out during the interview and the glass door to the treatment room was open. Defendant is correct that the defendant in <u>New</u> twice called a nurse into the treatment room during his interview and CI Sumner did not ask a technician into the room to draw blood until after Defendant had given consent for the blood draw. (<u>Id.</u> at 10 (citing <u>New</u>, 491 F.3d at 374); <u>see also</u> Hr'g Tr. at 26-27).) However, there is no evidence Defendant tried to call for medical help and was denied the opportunity to do so. The R&R relied on <u>New</u> for the proposition that "the Eighth Circuit Court of Appeals has determined that a hospital room where hospital staff may come and go from the room cannot be fairly described as police dominated, even when a defendant's physical condition or injuries render him immobile." (R&R at 22 (quotations omitted).) This is a fair reading of <u>New</u>. There is nothing in this record that indicates Defendant was not free to call for medical attention. Indeed, medical staff were

12

in and out of the room during the interview.  That the defendant in <u>New</u>, who

had been shot in the face and foot, called for medical attention, 491 F.3d at 374,

and Defendant did not, does not render <u>New</u> inappropriate precedent in this

instance.

Moreover, Defendant takes issue with the R&R's citations to <u>United States</u>

<u>v. Brave Heart</u>, 397 F.3d 1035, 1040 (8th Cir. 2005); <u>United States v. Makes Room</u>,

49 F.3d 410, 415 (8th Cir. 1995); and <u>Jenner v. Smith</u>, 982 F.2d 329, 334 (8th Cir.

1993), all of which stated that interviews were not custodial because, in part, the

length of the interviews did not render them "police dominated."  (R&R at 22-

24.)  Defendant points out that all of these cases also held that the defendants

were not in custody for <u>Miranda</u> purposes because the officers in the cases

clearly informed the defendants that answering questions was voluntary.  (Doc.

43 at 10-11.)  While that may be so, that does not mean the courts did not rule on

the fifth <u>Griffin</u> factor in the way the R&R said they did.  The R&R was using the

cases only to illustrate the narrow issue that the length of an interview can affect

whether the interview was police dominated.  The R&R clearly stated that the

decision on whether a defendant is in custody is based not only on the <u>Griffin</u>

factors, but rather on the totality of the circumstances and "the ultimate test is whether a reasonable person in that position would have felt free to end the interview." (R&R at 17 (cleaned up and citation omitted).)

Finally, as previously discussed, Defendant misrepresents CI Sumner's questioning of Defendant. While it is true that CI Sumner did not tell Defendant that R.M.R. had died, CI Sumner did not "repeat[] himself until he obtained the admissions he sought." (Doc. 43 at 9 (citing Hr'g Tr. at 37).) CI Sumner twice asked Defendant, "What happened?" (Hr'g Tr. at 36-37.) This is not repeated questioning in search of a specific answer. While CI Sumner did not tell Defendant that R.M.R. had died, he did not do so because Defendant was not next-of-kin and at that time CI Sumner did not believe Defendant had the right to know R.M.R.'s status. (Id. at 26.) Defendant again asserts that CI Sumner did not answer Defendant's question about whether he was going to jail, but nothing required CI Sumner to answer this question. (R&R at 21.) In addition, although CI Sumner knew that R.M.R. had died and even if CI Sumner knew Defendant was going to jail, something for which there is no evidence, the mere fact that an officer may have elicited admissions "through a variety of tactics, including . . .

14

playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, [and] conveying sympathy," does not render an admission involuntary unless "the overall impact of the interrogation caused the defendant's will to be overborne." Brave Heart, 397 F.3d at 1041 (addressing voluntariness of statements) (cleaned up).

Fifth, Defendant objects to the R&R's finding on the sixth Griffin factor: that Defendant was not arrested at the end of the interview. Defendant asserts that the only reason he was not arrested is that CI Sumner knew Defendant required a higher level of medical care and would be sent to Bemidji for treatment. (Doc. 43 at 11.) Defendant further asserts that CI Sumner's failure to answer his inquiries about whether he was going to jail are more important to the analysis than the recognition that he was being sent to Bemidji because the Eighth Circuit has recognized that the "most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." (Id. (ellipses in original) (quotation omitted).) Defendant argues that not only did the officers not tell him he was not going to

15

jail, but they left him with the impression that he <u>was</u> going to jail and therefore, Defendant reasonably felt he was in custody.  (<u>Id.</u> at 12.)

Defendant's objections are without merit.  First, the Court has already addressed Defendant's arguments related to CI Sumner's failure to inform Defendant he was not under arrest and could terminate the interview at any time.  Second, the <u>Griffin</u> analysis is an objective analysis, not a subjective one, 922 F.2d at 1351-52, and the Court does not find anything the officers did would give a reasonable person in Defendant's position on November 6, 2021 the impression that he was under arrest.  As discussed above, the interviews were calm, cordial, of short duration, and occurred in a room with a glass door. Healthcare professionals were in and out during the first interview.  Third, Defendant's argument that it appears the only reason he was not arrested after CI Sumner's questioning is that CI Sumner knew Defendant required a higher level of care that required his transfer to Bemidji misstates CI Sumner's testimony.  (<u>Id.</u> at 11 (citing Hr'g Tr. at 46).)  Not only does CI Sumner's testimony fail to support such a statement, but the Court's review of the entire Transcript also shows that neither CI Sumner nor CI Leyba testified that had

Defendant not needed a higher level of care, he would have been arrested.

Moreover, even if the officers had planned to arrest Defendant, something for

which there is no evidence, "a policeman's unarticulated plan has no bearing on

the question of whether a suspect is in custody at a particular time; the one

relevant inquiry is how a reasonable man in the suspect's position would have

understood his situation." Griffin, 922 F.2d at 1356 (quoting Berkemer v.

McCarthy, 468 U.S. 420, 442 (1984)).

The first Griffin factor weighs in favor of custody. All the other Griffin

factors and the totality of the circumstances weigh against custody. Therefore,

the Magistrate Judge's conclusion that Defendant was not in custody during the

two interviews is **affirmed.**

### B. Defendant's Objections Regarding the R&R's Warrantless Blood Draw Consent Analysis

Defendant argues that his consent to the blood draw was not valid and

therefore the results of that blood draw must be suppressed. He objects to

several of the Magistrate Judge's findings on the ten factors enumerated in

United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). The first four

factors relate to characteristics of Defendant, himself, and the six remaining

factors relate to the environment in which Defendant's consent was obtained.

For the following reasons, the Court will overrule Defendant's objections.

### 1.     Factors Related to Defendant's Characteristics

Defendant first argues that he could not validly consent to the blood draw

because he was intoxicated and had just been in a serious automobile crash.

(Doc. 43 at 14.)  He argues that he slurred, mumbled, and cried when he spoke

and that CI Sumner recognized that Defendant was intoxicated, which is

consistent with Defendant's BAC of 0.224.  (Id.)  Defendant states that he was

sleeping an hour after the blood draw when CI Sumner and CI Leyba came back

for the second interview and that he asked, "Who are you guys?" despite having

been with CI Sumner just an hour prior to that, which is further evidence that he

was not in a mental state to consent to a blood draw.  (Id. at 14-15.)  Defendant

also states that he had just been in a serious car accident and Defendant's

appearance in the hospital that day was consistent with someone who had been

in a traumatic wreck: he had blood on his shirt, arms, hands, face, and in his

mouth and was resting when CI Sumner entered his hospital room.  (Id. at 14;

(citing Hr'g Tr. at 35-36, 70).)

18

Defendant also argues that he twice refused consent for the blood draw but that CI Sumner "kept pressing him to consent to the blood kit." (Id. at 15 (cleaned up) (citing Hr'g Tr. at 22-35, 42-44).)  In addition, Defendant asserts that CI Sumner never told him that he was not under arrest, that he could refuse consent, and never did anything to "dispel his stated concern that he would be taken to jail if he failed to consent."  (Id.)  Thus, Defendant asserts that he merely acted out of fear. (Id. (citations omitted).)

The Court overrules Defendant's arguments related to his level of intoxication for the reasons cited in the R&R.  (R&R at 31-32.)  Here, both CI Sumner and Ci Leyba testified that although Defendant's speech was slurred, he followed the conversation, replied to questions appropriately, and was tearful when asking about the condition of R.M.R., a person he considered a sister.  As previously discussed, Defendant had the ability to recall details about his search for help after the accident such as names, workplaces of individuals, and even the spelling of an uncommon name.

The Court also overrules Defendant's arguments that CI Sumner never told him that he could refuse consent and that CI Sumner never did anything to

dispel his concern that he would not be taken to jail if he refused consent.  CI

Sumner gave Defendant a <u>Miranda</u> warning prior to obtaining the blood draw

and Defendant affirmatively acknowledged that he understood his rights before

he consented to the blood draw.  Defendant even denied consent initially and CI

Sumner started exiting the hospital room.

Defendant appears to misinterpret CI Sumner's testimony.  CI Sumner

testified that when he gave Defendant the <u>Miranda</u> warning, Defendant initially

responded, "I don't think I should.  Am I going to jail?"  (Hr'g Tr. at 25.)  CI

Sumner testified that these were "two separate" statements rather than "all kind

of one thing."  (<u>Id.</u> at 51.)  Additional evidence supporting this reasonable

interpretation rather than an interpretation that Defendant thought he would go

to jail if he did not submit to a blood draw is that Defendant also asked CI Leyba

if he was going to prison <u>after</u> the blood draw occurred and during an interview

in which he admitted that he consented to the blood draw.  (Gov. Ex. 1 at 1:39.)

### 2.    Factors Related to the Environment

Defendant argues that he was in custody for <u>Miranda</u> purposes when he

provided "purported consent" for the blood draw.  (Doc. 43 at 16.)  He notes that

CI Sumner was in full police uniform including weapons and handcuffs and that

CI Sumner stood near Defendant when he asked him to submit to the blood

draw.  (Id.)  According to Defendant, this all occurred in a "secluded hospital

room which was closed to the public and open only to authorized personnel"

where Defendant was without the moral support of family or friends, and no

medical personnel were in the room at the time that he purportedly consented to

the blood draw.  (Id. at 17.)  Defendant argues that he badly needed moral

support at that time because he was "emotional," "nearly crying," "couldn't

make eye contact," was slurring his words, and seemed groggy.  (Id. (citing Hr'g

Tr. at 20-21, 38-39).)  Defendant also argues that the R&R reasons that because he

"silently cooperated while the blood draw was actually performed, he

voluntarily consented," which Defendant argues conflicts with precedent stating

that the Government cannot meet its burden to prove valid consent by merely

showing acquiescence to a claim of lawful authority.  (Id. (citing United States v.

Escobar, 389 F.3d 781, 785 (8th Cir. 2004).)  Finally, although Defendant does not

fully argue this point, he states in his argument conclusion that the atmosphere

was police dominated.  (Id. at 18.)

21

For the reasons already discussed, to the extent Defendant asserts that the environment was police dominated, that argument is overruled.  In addition, although Defendant portrays his hospital room as secluded and cut off from everyone but authorized personnel, the room had a glass door that was open when CI Sumner was speaking to Defendant.  And, while no one was in the room other than Defendant and CI Sumner at the moment Defendant consented to the blood draw, healthcare personnel were in and out the room during this time.  CI Sumner made no attempt to keep them out of the room or to isolate Defendant.  Likewise, Defendant's reliance on Escobar is misplaced.

In Escobar, the Eighth Circuit held that when a police officer falsely represented to a bus passenger that a drug-sniffing dog had alerted on her bags, he communicated there was probable cause to search the bags and she had no choice but to permit the search.  389 F.3d at 786.  This, along with the agent's failure to tell the passenger she had the right to refuse the search, tainted her consent.  Id.  Here, Defendant was given a Miranda warning, consented to the blood draw, and then quietly allowed the blood draw to occur.  Defendant reiterated that he had given consent to the blood draw when he spoke to CI

Leyba.  (Gov. Ex. 1 at 3:51-4:09.)  Again, the fact that CI Sumner walked away

when Defendant initially refused consent distinguishes the facts of this case from

the coercive facts of <u>Escobar</u>.   On the other hand, the cases relied on in the R&R

are cases wherein cooperation during a blood draw indicated voluntary consent,

often after giving verbal consent, as in this case.  <u>See, e.g.</u>, <u>United States v. Dow</u>,

No. 10-cr-65 (MJD/RLE), 2010 WL 2679942, at *8 (D. Minn. June 11, 2010), <u>R&R</u>

<u>adopted</u>, 2010 WL 2679955 (D. Minn. June 30, 2010); <u>United States v. Deserly</u>, No.

17-cr-217 (WMW/LIB), 2017 WL 8787046, at *6 (D. Minn. Dec. 5, 2017), <u>R&R</u>

<u>adopted</u>, 2018 WL 740386 (D. Minn. Feb. 7, 2018).

### 3.   Conclusion

All of Defendant's objections regarding the R&R's warrantless blood draw

consent analysis are **overruled.**  The R&R's conclusion that Defendant provided

voluntary consent for the blood draw is **affirmed.**

### C.   Defendant's Objections Regarding his Waiver of <u>Miranda</u> Rights During his Interview with CI Leyba

Defendant argues that he did not validly waive his <u>Miranda</u> rights during

his interview with CI Leyba.  (Doc. 43 at 18-23.)  The R&R concluded that

Defendant was not in custody for this interview and therefore did not address

whether Defendant had properly waived his <u>Miranda</u> rights prior to the interview. (R&R at 24 n.17.) The Court has adopted the R&R's finding that Defendant was not in custody for either interview on November 6, 2021, and therefore also adopts the R&R's finding that <u>Miranda</u> warnings were not necessary for either interview. Therefore, the Court need not address Defendant's arguments on this issue. However, in an abundance of caution as part of its de novo review and to create a complete record in this case, the Court will address Defendant's arguments.

      **1.**    **Discussion**

As discussed above, CI Leyba's interview with Defendant was recorded and entered into evidence as Government's Exhibit 1. The R&R included the relevant portion of that interview. (<u>Id.</u> at 5-6.) This is the portion of the R&R the Court modified to add three omitted lines. <u>See</u> <u>supra</u> Part II.

A valid <u>Miranda</u> waiver must be (1) voluntary, "in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception" and (2) the defendant must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences

of the decision to abandon it."  United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  The Government has the burden of proving by a preponderance of the evidence that Defendant made a valid waiver of his Miranda rights.  See Colorado v. Connelly, 479 U.S. 157, 168 (1986); United States v. Figueroa-Serrano, 971 F.3d 806, 814 (8th Cir. 2020).

Defendant argues that the Government did not provide sufficient evidence to show that he understood his Miranda rights and the consequences of waiving them during his interview with CI Leyba.  Vinton, 631 F.3d at 483; see also Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010) (noting that a valid Miranda waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").  In support of his argument, Defendant argues that he "was not in a physical or mental state to validly waive his rights" because he was sleeping when CI Sumner and CI Leyba entered his hospital room, turned on his lights, and began taking photographs without his permission.  (Doc. 43 at 20 (citing Hr'g Tr. at 66-69; Gov't Ex. 1; United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989) (courts must consider the suspect's ability to resist coercion).)  According to Defendant, this entry into

25

his hospital room confused him, as evidenced by his "repeatedly ask[ing] 'Who are you guys?' and 'Why are you doing this?'" (Id. (citing Gov. Ex. 1 at 0:35–46).) Defendant notes that he stuttered, mumbled, and cried throughout the encounter and told the officers that his head hurt.  (Id. (citing Gov. Ex. 1 at 1:32–36).)  He argues that his "lack of awareness of the situation is especially striking, given that he had already twice met with [CI] Sumner earlier that morning."  (Id. (emphasis in original) (citing Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001) (courts must consider the mental state of the accused to determine whether he was "susceptible to having his will overborne").)

Defendant also argues that the officers "seized upon [his] concern" for R.M.R. and his concern that he would be taken to prison by never answering his questions and never telling him he was suspected of homicide and instead pressing him for information about the crash.  (Id. at  21.)  Against this backdrop, Defendant argues that his Miranda waiver was the product of "intimidation, coercion, or deception."  (Id. (citing Figueroa-Serrano, 971 F.3d at 814).)

Defendant also argues that because CI Leyba "speed-recited" the Miranda warning "in a difficult-to-understand manner," any argument that he

knowingly waived his rights is undercut.  (<u>Id.</u> (citing, <u>inter alia</u>, <u>United States</u>

<u>v. Payne</u>, No. 4:15-cr-245 (HEA/SPM), 2015 WL 6445460, at *8–9 (E.D. Mo. Aug.

24, 2015), <u>R&R adopted</u>, 2015 WL 6445352 (Oct. 23, 2015).)  In addition,

Defendant notes that both CI Sumner and CI Leyba saw signs that Defendant

was intoxicated and groggy during questioning.  Indeed, Defendant asserts that

he sounds "altogether exhausted, confuse, and scared" on Government's Exhibit

1, CI Leyba's recording of his interview with Defendant.  (<u>Id.</u> at 22.)

Finally, Defendant argues that the R&R placed too much emphasis on his

experience with the criminal justice system and relied on insufficient and

unreliable evidence to conclude that this factor favored a knowing waiver.

Defendant argues that while CI Sumner testified that he believed Defendant had

previous criminal tribal history that might have involved his arrest, and that

Red Lake Police Department policy requires officers to provide <u>Miranda</u>

warnings upon arrest, this does not mean that Mr. Johnson in fact received

<u>Miranda</u> warnings before the interrogations, as evidenced by CI Sumner's

admission that he violated this policy when he initially questioned Defendant at

the Red Lake Hospital without providing a <u>Miranda</u> warnings.  (<u>Id.</u> (citing Hr'g

Tr. at 29, 52).)

     The Court has reviewed Government's Exhibit 1 and finds that Defendant

provided a valid waiver to his <u>Miranda</u> warning.  First, Defendant did not

"repeatedly" ask who the officers were and what they were doing in his hospital

room.  The relevant exchange between Defendant and CI Leyba follows:

> CI Leyba:    Gerald, how 'ya doing?  I'm gonna turn on the light a
> little bit here, okay, so we can see.  I am going to take
> some pictures of you. Okay.  Of your injuries.  Okay?
>
> Defendant:  Who, who are you guys?
>
> CI Leyba:    I am a criminal investigator with the Red Lake PD.  I am
> also a TFO with the FBI. Okay.
>
> Defendant:  'Right. Why do you need this?
>
> CI Leyba:    Because I have to take pictures of your injuries, Sir.  I
> have to find out what injuries you have, and I am just
> going to take a couple pictures of you. Okay?
>
> Defendant:  How's [R.M.R.]?
>
> CI Leyba:    I don't know. I don't know at this time and stuff.  What
> was going on?  Want to tell me what was going on?
>
> Defendant:  Is she alive?
>
> CI Leyba:    That I don't know, okay. I can't tell you any information
> right now, Sir.  Okay.
>
> Defendant:  'Right
>
> CI Sumner:  What's your full name and date of birth, Gerald?
>
> Defendant:  [Provides full name and date of birth.]
>
> CI Leyba:    How old are you?
>
> Defendant:  Twenty-five.  Does your head hurt?
>
> Defendant:  Yeah, I guess.

| | |
|---|---|
| CI Leyba: | Okay. |
| Defendant: | Am I, am I going to prison? |
| CI Leyba: | Um. Well, let's start from the beginning here. If you want to talk to me, you can. I do have to advise you of your rights though, okay. I know that [CI Sumner] had already talked to you.  So, if you want to talk to me, I'll advise you of your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to a lawyer. If you cannot afford one, one will be appointed to you at no cost.  Do you understand each of these rights that I read to you, Sir? |
| Defendant: | Um hm. |
| CI Leyba: | Okay. Do you want to tell me what happened tonight or this morning? |

(Gov. Ex. 1 at :23-2:09.)  Defendant and CI Leyba then discussed the accident,

Defendant's relationship with R.M.R., and that Defendant was likely going to be

sent to Bemidji for further care.  (Id. at 2:11-4:41.)

In addition, despite not answering questions about R.M.R's condition or

whether he was going to prison and despite not telling Defendant he was a

suspect, there is no indication that CI Leyba "seized upon [Defendant's] concern"

for R.M.R. and his concern that he would be taken to prison if he did not answer

questions.  There is no objective evidence that Defendant believed he would be

taken to prison if he did not answer questions.

Furthermore, while it is true that CI Leyba recited the <u>Miranda</u> warning quickly, he did not do so in a "difficult-to-understand manner." (<u>Id.</u> at 1:55-2:05.) His diction was clear and the words of the warning were understandable and did not run together. <u>See</u> <u>United States v. Cibrian-Lopez</u>, No. 18-CR-4002-MWB, 2018 WL 2978047, at *4 (N.D. Iowa May 25, 2018) (finding that defendant who was not a native-English speaker was "sufficiently proficient in English to knowingly and intelligently waive her <u>Miranda</u> rights" when <u>Miranda</u> warning was recited to her "extremely quickly" because defendant indicated she understood and she answered most questions quickly and responsively), <u>R&R adopted</u>, 2018 WL 2976428 (N.D. Iowa June 13, 2018).

The facts of this case are also distinguishable from the facts of <u>United States v. Payne</u>, upon which Defendant relies. No. 4:15-cr-245 (HEA/SPM), 2015 WL 6445460 (E.D. Mo. Aug. 24, 2015), <u>R&R adopted</u>, 2015 WL 6445352 (Oct. 23, 2015). Defendant cites <u>Payne</u> for the proposition that the Government failed to show the defendant in that case gave a valid <u>Miranda</u> waiver because the defendant speed-read the <u>Miranda</u> advisory. (Doc. 43 at 21 (citing <u>Payne</u>, 2015 WL 6445460, at *8–9)).) However, in <u>Payne</u>, the court found multiple issues with

the defendant's purported waiver of consent.  First, the FBI agent in <u>Payne</u> asked

the defendant to sign a consent form that said, "I have read this statement of my

rights and I understand what my rights are.  At this time, I am willing to answer

questions without a lawyer present."  WL 6445460, at *2–3 (emphasis omitted).

The defendant said, "I mean I don't want to sign that's a consent. I'm not giving

any kind of consent to anything." <u>Id.</u> at *2.  The court found this refusal to sign

the consent form an unambiguous invocation of <u>Miranda</u> rights. <u>Id.</u> at *7–8.  In

addition, the court found that the defendant was never verbally apprised of his

<u>Miranda</u> rights, but that the agents relied on his reading of a printed form and

one of the FBI agents continued to talk after the defendant told him to "hold on"

as he read through the rights portion of the form "with increasing speed," which

may have distracted the defendant from even reading the last portion of the

statement of his rights. <u>Id.</u> at *2, *8.  The court also found that neither FBI agent

ever asked if the defendant had been able to read all the rights listed on the form.

<u>Id.</u> at *9.

Here, however, CI Leyba gave a verbal warning and Defendant said he

understood his rights and then spoke to CI Leyba.  A defendant may

implicitly waive his <u>Miranda</u> rights by continuing to respond to officers'

questions after being advised of his rights.  "The Constitution . . . does not

require that officers use a waiver form" or even that they "obtain an

affirmative answer to a question such as, 'Do you waive these rights?' " <u>United</u>

<u>States v. Pearson</u>, No. 15-CR-117 (JRT/TNL), 2015 WL 6445439, at *13 (D. Minn.

Oct. 23, 2015) (citations omitted).  Rather, a valid <u>Miranda</u> waiver may be

inferred from the fact that a defendant responds to questions posed by an

interviewer after being advised of his rights.  <u>See id.</u> (gathering cases).

Finally, though Defendant makes much of the fact that officers did not

know the specifics of his prior experience with <u>Miranda</u> warnings  (Doc. 43 at

22 (citing Hr'g Tr. at 29, 52)), CI Sumner testified that on November 6, 2021, he

knew that Defendant's criminal history included three arrests for driving under

the influence on the Red Lake Reservation and one disorderly conduct charge.

(Hr'g Tr. at 29.)  Defendant notes that although CI Sumner testified that when

someone is arrested by the Red Lake Police Department, they are given <u>Miranda</u>

warnings, there is no evidence that Defendant was, indeed, given <u>Miranda</u>

warnings when he was arrested for his prior crimes.  However, when

determining if a defendant's statement is voluntary, the court does not consider a defendant's experience with <u>Miranda</u>, specifically, but rather his experience with the criminal justice system.  See <u>United States v. Nguyen</u>, 608 F.3d 368, 375 (8th Cir. 2010) (affirming that defendant's statements were voluntary, in part, because of the defendant's experience in the criminal justice system, and saying nothing about experience with police interviews or <u>Miranda</u> warnings); <u>United States v. Boslau</u>, 632 F.3d 422, 429 (8th Cir. 2011) (same).

### 2.      Conclusion

The Court finds that even if Defendant had been in custody during his second interview, he knowingly and voluntarily waived his <u>Miranda</u> rights before he was interviewed by CI Leyba.

## IV.   ORDER

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1.   The Court **ADOPTS AS MODIFIED** the Report and Recommendation of United States Magistrate Judge Leo I. Brisbois dated January 13, 2023 **(Doc. 40)**;

2.      Defendant's Motion to Suppress Statements, Admissions, and

Answers **(Doc. 24)** is **DENIED**; and

3.      Defendant's Motion to Suppress Evidence Obtained as a Result of

Search and Seizure **(Doc. 25)** is **DENIED**.

Dated:  March 29, 2023                    s/Michael J. Davis
                                          Michael J. Davis
                                          United States District Court